```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
```

|  |  |
|---|---|
| ENGIDASHET W. GEBRE,<br>      Plaintiff, | )<br>)<br>) |
|       v. | ) CIVIL ACTION<br>) NO. 05-11321-WGY |
| CONDOLEEZZA RICE,<br>as Secretary of State,<br>and<br>DEPARTMENT OF STATE<br>      Defendants. | )<br>)<br>)<br>)<br>)<br>) |

<u>MEMORANDUM AND ORDER</u>

YOUNG, D.J.                                      November 21, 2006


1.   **INTRODUCTION AND UNDISPUTED FACTS**

In this action the plaintiff, Engidashet W. Gebre ("Gebre"), seeks an order in the nature of a writ of mandamus against the defendants, Department of State and Secretary of State Condoleeza Rice to compel them to issue an immigrant visa to his wife, Tiringo T. Tegebelu ("Tegebelu").

Gebre is an immigrant from Ethiopia who applied and "won" a visa through the Diversity Visa Program's "visa lottery" for the United States fiscal year 2002. At the time of his initial application to the Diversity Visa Program, Gebre was single and therefore listed no one as accompanying him to the United

States.

On April 21, 2001, approximately six weeks after the notification of his initial selection for the Diversity Visa Program had been mailed to him, Gebre married Tegebelu. As part of the application process, immigrants must undergo an interview with United States immigration officials. On August 13, 2002, Gebre went to the United States Embassy in Addis Ababa, Ethiopia for his interview. He brought along his new wife, who applied for a derivative visa at that time. The proper procedure to add a relative to a visa application (as a derivative) is to notify the United States Department of State that the primary applicant is now married. Gebre and Tegebelu did just that.

Indeed, the Government admits that Gebre did everything in a timely manner in order to introduce his wife's application. Tr. of Mot. Hr'g at 11. It claims, however, that the application sequence on this case provided grounds for questioning whether the marriage was bona fide rather than opportunistically entered in order to confer an immigration benefit. Since there were only six weeks left in the United States fiscal year, it argues that there was not enough time to verify the facts provided in the application. Thus, it simply sent back Tegebelu's application fee and declined to give her a visa.

The Government moves to dismiss. While every well-pleaded

fact is, of course, assumed to be true and all inferences are drawn in Gebre's favor, Coyne v. City of Somerville, 972 F.2d 440, 442-43 (1st Cir. 1992), the Court takes judicial notice of its own records, Fed. R. Evid. 201, to determine that this case was filed on June 20, 2005. Likewise, the Court takes judicial notice that the 2002 United States fiscal year ended at midnight, September 30, 2002.

## II.  DISCUSSION

### A.  Diversity Visas

Congress instituted the Diversity Visa Program in 1990. Each year, this program provides visas to individuals from countries historically low in immigration admissions to the United States. 8 U.S.C. § 1153. These are known as "diversity visas." A total of 55,000 visas are allotted to the program annually. 8 U.S.C. § 1151(e). In order to distribute these visas, the Department of State holds a "lottery" each summer for those who have petitioned to be considered for a diversity visa. 22 C.F.R. § 42.33(c) (implementing 8 U.S.C. § 1154(a)(1)(a)). "Winners" of the lottery are then eligible formally to apply for citizenship. Id.

Selection as a "lottery winner", however, does not ensure that the applicant will receive a visa. The total number of lottery winners exceeds the number of diversity visas

3

available (approximately 100,000 lottery winners for the 55,000 visas).[1] Therefore, a lottery winner obtains only the right to apply to receive a visa through the Diversity Visa Program. Once selected to participate in the program, petitioners must submit numerous documents and undergo an extensive background review.

If an applicant obtains the right to apply for a visa under the program, that applicant's spouse and children under the age of twenty-one are entitled to the same status as the applicant as well. 8 U.S.C. § 1153(d). Therefore, this case is analyzed as though Tegebelu herself had been the lottery winner.

### B. Mandamus

District courts have mandamus jurisdiction "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Mandamus relief will be granted if the plaintiff can demonstrate that three enumerated conditions are present: (1) a clear right to the relief sought; (2) that the defendant has a duty to do the act in question; and (3) no other adequate remedy is available. Nyaga v. Ashcroft, 323 F.3d 906, 911

---

[1] The excess number of petitions selected are "to ensure, to the extent possible, usage of all immigrant visas authorized." 22 C.F.R. § 42.33(c).

(11th Cir. 2003) (citing Heckler v. Ringer, 466 U.S. 602, 617 (1984)).

Article III of the United States Constitution limits federal courts to the adjudication of actual cases or controversies. U.S. Const. art. III, § 2, cl. 1. "Mootness is a jurisdictional defect, rooted in Article III case or controversy considerations." Horizon Bank & Trust Co. v. Massachusetts, 391 F.3d 48, 53 (1st Cir. 2004)(citing United States v. Reid, 369 F.3d 619, 624 (1st Cir. 2004)). "Courts cannot, consistent with Article III, wander into the 'realm of the advisory and the hypothetical.'" Id. (quoting Oakville Dev. Corp. v. FDIC, 986 F.3d 611, 615 (1st Cir. 1993)). "[A] case is moot when the court cannot give any 'effectual relief' to the potentially prevailing party." Id. (citing Church of Scientology v. United States, 506 U.S. 9, 12 (1992)).

C.  **Analysis**

Whether one views the outcome of this case as dependent on a failure of the "duty" prong of the mandamus test[2] or – as

---

[2] The Government has argued in other cases that one in Tegebelu's position has no right even to an adjudication of her application – the first prong of mandamus. The statute is written in sufficiently mandatory language, however, for most courts to reject this argument. See, e.g., Iddir, v. Immigration and Naturalization Serv., 301 F.3d 492, 499-500 (7th Cir. 2002); Coraggioso v. Ashcroft, 355 F.3d 730, 734 (3d Cir. 2004). But see Diallo v. Reno, 61 F. Supp. 2d 1361, 1368-71 (N.D. Ga. 1999). The Government makes no such argument

5

most courts have – on a conclusion that the case is moot because any order would be futile, the Government argues here this Court cannot give relief to Gebre.[3] At least three circuit courts and numerous district courts that have taken up the issue have almost unanimously concluded that once the fiscal year has ended, there is nothing any court can do to force the executive to issue a diversity visa.

Title 8, section 1154(a)(1)(I)(ii)(II) of the United States Code provides that "[a]liens who qualify, through random selection, for a visa under section 1153(c) of this title [the diversity visa provision] shall remain eligible to

---

here.

[3] The Government argues that Tegebelu did not even have a right to receive a diversity visa. It claims that Gebre should have listed his spouse on his original petition. Mem. in Supp. of Defs.' Mot. To Dismiss [Doc. No. 8] ("Defs.' Mem.") at 5-6. The Government alleges that this requirement is extremely important to prevent fraud in the visa process. See id., Ex. A ("Decl. of Jeffery Gorsky"), ¶ 7.

Since Gebre was not married at the time of his petition, however, he could not have listed Tegebelu on his application. The wording of the statute and regulations relating to spouses suggest that the inclusion of these relatives is of no moment. The language is all in the present tense, indicating that a spouse at the time of the visa being issued is eligible to receive a derivative visa. See 8 U.S.C. § 1151(b)(2)(A)(1); 22 C.F.R. § 42.53. Moreover, that the Government accepted Tegebelu's application fee tendered at Gebre's interview at the U.S. Embassy belies any contention that she was wholly ineligible to enter in this manner. This Court's decision today is based on the fact that Gebre was permitted to add Tegebelu to his application and that he did so properly.

receive such visa only though the end of the specific fiscal year for which they were selected." The administrative regulations further provide that "[a] petition approved pursuant to paragraph (c) of this section [the visa lottery] will be valid for a period not to exceed Midnight of the last day of the fiscal year for which the petition was approved." 22 C.F.R. § 42.33(d). "Under no circumstances may a consular official issue a visa . . . to an alien after the end of the fiscal year which an alien possesses diversity visa eligibility." 22 C.F.R. § 42.33(a)(1).

> As the Eleventh Circuit has explained:
>
> [T]he phrase 'shall remain eligible to receive such visa' plainly means that aliens . . . who have been randomly selected to qualify for a visa under the diversity visa program cannot be issued a visa after midnight of the final day of the fiscal year for which they were selected. As of midnight on September 30 . . . [the plaintiff] was no longer eligible to receive an immigrant visa. The INS's failure to process [the plaintiff's] application does not extend [his] statutorily limited period of eligibility for a diversity visa. 'Eligible to receive such visa' is unambiguous, and because the phrase is unambiguous, our inquiry must end with the statute's plain language."

Nyaga, 323 F.3d at 914 (citing 8 U.S.C. § 1154(a)(1)(I)(ii)(II)). "The plain meaning of § 1154 is that after the fiscal year has ended on September 30, no diversity visas may be issued nunc pro tunc based on the results of the previous year's visa lottery." Zapata v. Immigration and

Naturalization Serv., 93 F. Supp. 2d 355, 358 (S.D.N.Y. 2000) (emphasis in original). "Because we conclude that [the plaintiff] is no longer eligible to receive a visa, the district court could not provide meaningful relief to the [plaintiff] and the court was compelled to dismiss the case as moot." Nyaga, 323 F.3d at 916.

Almost every court to have analyzed this issue – including the Third and Seventh Circuits – has reached the same result as the Eleventh Circuit in Nyaga. E.g., Coraggioso, 355 F.3d 730 (3d Cir. 2004); Iddir, 301 F.3d 492 (7th Cir. 2002); Lavelle v. United States Dep't Homeland Sec., No. 04-0524, 2004 WL 1975935 (N.D. Cal. Sept. 7, 2004); Ticheva v. Ashcroft, 241 F. Supp. 2d 1115 (D. Nev. 2002); Vladagina v. Ashcroft, No. 00-9456, 2002 WL 1162426 (S.D.N.Y. 2000); Diallo, 61 F. Supp. 2d 1361 (N.D. Ga. 1999); see also Carriloo-Gonzalez v. Immigration and Naturalization Serv., 353 F.3d 1077 (9th Cir. 2003). Many of these courts have made their rulings in the face of infuriatingly bureaucratic nonfeasance or misfeasance or in excruciating circumstances. See, e.g., Coraggioso, 355 F.3d at 734-35 ("The equities of the situation clearly give us pause. Having lived in the United States since the age of four, [the plaintiff] is more truly American than Italian. He is neither a criminal nor a

8

burden on society. In addition, it appears [the plaintiff] would have been entitled to a diversity visa . . . if the INS had performed its statutorily mandated duty and timely adjudicated his parents' [Diversity Visa] Program applications. . . . [The plaintiff] will be forced to leave behind his family, friends and the only life he can remember.").

The rule is clear, a diversity visa lottery winner must submit his application and hope to have it adjudicated favorably <u>before the end of the fiscal year</u> for which his diversity visa was issued. No exceptions.

The present case presents the same situation. Gebre was single when he won the visa lottery. As soon as he got married he followed the prescribed procedure to add his wife to his application. He did everything he was supposed to do. Due solely to the inaction of the State Department and its apparently unfounded suspicions about the validity of the marriage, Tegebelu's application was never adjudicated.

The manner in which Congress has continued to administer the Diversity Visa Program supports this interpretation. The Government points to several instances where, due to acts of terrorism or bureaucratic snafu, large numbers of diversity visa applicants were not issued permanent resident status

before the end of the fiscal year in which they were eligible to receive it. In these instances, Congress provided a specific remedy for those applicants by taking those visas from the next year's allotment even though there were leftover diversity visas from the previous year. E.g., Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 637, 110 Stat. 3009, 3009-546 (Sept. 30, 1996). The clear implication is that once the fiscal year is over, unused diversity visas from that fiscal year are no longer available to be issued.

Even though immigration statutes are normally construed in favor of aliens, see Iddir, 301 F.3d at 497 (citing, *inter alia*, Immigration and Naturalization Servs. v. Cardoza-Fonseca, 480 U.S. 421, 449 (1987)), the statute governing the Diversity Visa Program is unambiguous. Moreover, given the First Circuit's recent statements in Enwonwu v. Gozalez, 438 F.3d 22 (1st Cir. 2006), this Court is now hesitant to give any immigration statute an expansive reading:

> Over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens. Our cases have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.

Id. at 31 (quoting Fiallo v. Bell, 430 U.S. 787, 792 (1977))

10

(alteration omitted). Language in other Supreme Court Cases support this sentiment:

> The power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications.

Kleindeinst v. Mandel, 408 U.S. 753, 766 (1972). "The power to confer citizenship upon aliens rests solely with Congress, as delegated to the Executive branch to administer." Iddir, 301 F.3d at 500. Therefore, "the judiciary will not interfere with the visa-issuing process," Diallo, 61 F. Supp. 2d 1361, 1366 (citing Wan Shih Hseih v. Kiley, 569 F.2d 1179, 1181 (2d Cir. 1978)), notwithstanding the fact that the State Department here has failed to carry out the clear intent of Congress.

In his complaint, Gebre cites several cases in which the district court, in fact, did grant mandamus relief. See Gebre's Opp'n to Defs.' Mot. to Dismiss [Doc. No. 10], at 8-9 (citing Przhebelskaya v. United States Bureau of Citizenship & Immigration Servs., 338 F. Supp. 2d 399 (E.D.N.Y. 2004); Paunescu v. Immigration and Naturalization Serv., 76 F. Supp. 2d 896 (N.D. Ill. 1999); Marcetic v. Immigration and Naturalization Serv., No. 97-7018, 1998 WL 173129 (N.D. Ill. Apr. 6, 1998)); see also Kobzev v. United States Immigration and Naturalization Serv., No. 00 C 4576, 2001 WL 12011 (N.D.

Ill. Jan. 4, 2001). In three of these cases, however – Paunescu, Kobzev and Przhebelskaya – the plaintiffs filed their federal lawsuit <u>before the fiscal year had ended</u>. They had each convinced the district court to issue a writ of mandamus while the Government still had time to review their application and issue a diversity visa. True, in some of these cases the Government did not do so before the end of the fiscal year, yet this is only marginally relevant. A court has inherent power to have its orders followed. United States v. Hudson, 11 U.S. (7 Cranch) 32, 34 (1812).

Only in Marcetic did the plaintiff fail to file his lawsuit before the end of the fiscal year. 1998 WL 173129, *1. There, however, a hearing officer had ordered the INS to issue the visa within the requisite time, and the district court merely was giving effect to that executive decision. Id. Marcetic is the only such case. Moreover, it is one of the earliest cases on the topic and was issued in a circuit that since has clearly rejected its approach. See Iddir, 301 F.3d 492 (7th Cir. 2002).

Paunescu, Kobzev and Przhebelskaya demonstrate the best means for diversity visa applicants to force the Government to adjudicate their applications before the fiscal year is out. The Government has suggested that Gebre file an I-130

12

(petition for alien relative) for Tegebelu. Compl., Ex. B. Other "solutions" offered by courts that have considered this issue include Tegebelu petitioning and winning the diversity visa lottery herself. See Iddir, 301 F.3d at 492, 501. Tegebelu could also take up the Seventh Circuit's charge and "lobby Congress to alter the statutory scheme." Id. at 501. Perhaps Congress could pass a private bill granting her a visa. As far-fetched as this last suggestion seems, there is quite a bit of precedent for it. See Iddir, 301 F.3d at 501 (citing such bills); Nyaga, 323 F.3d at 919 n.9 (same).

    D.    **Implementing the Congressional Mandate**

So it is that a beneficent, socially progressive act of Congress, designed to improve the richness and strength of our polity (and increase our outreach and standing among the nations of the world), is here again implemented in such a fashion as to make the United States appear unfeeling, arbitrary, and capricious, and to render an act of Congress an object of derision. How can this be? Perhaps the Congress has not adequately funded the State Department to enable it to carry out the Congressional will. Perhaps that Department has not effectively deployed its resources in the Third World. Perhaps the executive has priorities other than full implementation of this law. Perhaps the fault is bureaucratic

indifference or mismanagement at a lower level. Whatever the cause, one thing is certain. Congress has intentionally excluded the judiciary from adjudicating most matters concerning aliens. Ironically, Congress has thus weakened its ability to work its will on the executive. By depriving the judiciary of its traditional role in explicating the Congressional will to the executive, Congress is left playing legislative catch-up - a slow and uncertain process. This case offers a prime example. Aware of the injustices of the present system, Congress is considering a bill that would permit aliens who win the lottery and make prompt application to remain eligible for a diversity visa beyond the fiscal year in which the application was filed. S. 1119, 109th Cong. (2005). This, of course, would reintroduce an element of fundamental fairness into the system and would ensure that no diversity visa lapses due to bureaucratic inertia. Passage of this draft legislation is uncertain.

    The judicial check on the executive is absent in cases like this, and the current system provides no political voice for immigrant aliens. "It is not the business of the courts to tell Congress what to do about public policy choices, but we are entitled to warn when the machinery that we help administer is breaking down." Kim v. Gonzales, No. 05-2462,

2006 WL 3317662, \*5 (1st Cir. Nov. 16, 2006). If the judicial system, which sees the human results of unjust laws, does not paint the "unpleasant picture of the INS and what appears to be its bureaucratic inefficiency and ambivalence," then there are few who can. <u>Ticheva</u>, 241 F. Supp. 2d at 1118.

**III.     CONCLUSION**

Despite the harsh result in this case, it is the accepted interpretation of a clear statute that this Court simply does not have the power to grant relief to Gebre's wife because the fiscal year of his diversity visa, 2002, has expired. Ordering the Government to issue Tegebelu a visa would be a futile act. Accordingly, the goverment's Motion to Dismiss [Doc. No. 7] is ALLOWED and this case is DISMISSED.

          SO ORDERED.

                              /s/ William G. Young
                              _____
                              WILLIAM G. YOUNG
                              DISTRICT JUDGE